UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEBORAH BRYANT,   Case No. 15-1568-pp[1]

      Plaintiff,

v.

JENNIFER M. RAMOS,

      Defendant.

---

**ORDER GRANTING MOTION TO DISMISS CASE AS TO DEFENDANT JENNIFER RAMOS (DKT. NO. 5), EFFECTIVE MARCH 17, 2017**

---

I.   **Facts**

According to the plaintiff's complaint, the plaintiff is an "actress, model and a reality-television star" living in Atlanta, Georgia. Dkt. No. 1 at 2. In September 2015, a friend of the plaintiff's invited her to a restaurant in downtown Milwaukee called Elsa's on the Park. Id. The plaintiff and her friend arrived at the restaurant together, but she asserts that "because [she] is famous," other restaurant customers "began sitting next to and around [her] to converse with her." Id.

At some point, a person named "Nate" called 911, and told the dispatcher that he was a bartender at Elsa's, and that there was a "rowdy crowd" that was "causing a disturbance," and that "almost a fight broke out." Id. at 3. Then

---

[1] The court has consolidated this case with Bryant v. Wuerl, 16-cv-213-pp. Dkt. No. 25. The court uses the original case number for the Ramos complaint, because this motion to dismiss does not appear in the docket entries for 16-cv-213. **The court asks the clerk of court to docket this order under both case numbers**.

1

Brittany Wuerl, the manager of Elsa's, called 911 a second time, indicating that she was "still waiting for police assistance," and that she was "trying to contain the people." Id. Wuerl told the dispatcher that "there is only one person left from that group," and that Wuerl wanted the police to come before that person left. Id. Wuerl indicated to the dispatcher that the plaintiff was "on the reality television show *Love and Hip Hop* and that 'people know' who she is." Id.

Defendant Officer Jennifer Ramos went to Elsa's, and spoke with Wuerl. Id. Wuerl told the defendant that the plaintiff "refused to pay 'the group's' bill." Id. The defendant also spoke with Nina Dismukes, a server at Elsa's. Id. at 4. It is not clear what, if anything, Dismukes told the defendant, but the plaintiff asserts that she "did not tell [the defendant] that [the plaintiff] refused to pay for the food and beverages that she ordered." Id. Finally, the defendant spoke with the plaintiff herself. The plaintiff "told [the defendant] that [the plaintiff] did not agree to pay for food and beverages ordered by other patrons." She also told the defendant that "Elsa's was trying to make [the plaintiff] pay for 'the group's bill' because she is famous." Id.

The defendant arrested the plaintiff, and "sought the prosecution" of the plaintiff "for absconding without paying." Id. The complaint alleges that at the time the defendant arrested the plaintiff, the defendant "knew that [the plaintiff] was a famous person." Id. at 6. It alleges that the plaintiff did not abscond from Elsa's without paying; rather, she "offered to pay for the food and beverages that she actually ordered." Id. at 4. The plaintiff maintains that Wuerl was not happy with this offer, and "tried to intimidate [the plaintiff] into

2

paying for 'the group's' bill by telling [the plaintiff] the police were coming." She argues that "[w]hen that did not work, Wuerl convinced [the defendant] [sic] join in the intimidation of [the plaintiff]." Finally, she argues that when the plaintiff refused to be intimidated, the defendant arrested her, "jailed her, and made a criminal referral for absconding without paying." Id. at 5. The prosecutor declined to issue charges. Id.

II. **Allegations**

The plaintiff alleged that the defendant violated her Fourth Amendment rights under 42 U.S.C. §1983 by detaining her without reasonable suspicion. Id. She also alleged that the defendant violated her Fourth Amendment rights by unlawfully arresting her. Id. at 6. Finally, she alleges that the defendant violated her Fourteenth Amendment equal protection rights by treating her differently from others on the basis that she is famous. Id. at 7-8.

III. **Motion to Dismiss**

The defendant has asked the court to dismiss the case against the defendant under Fed. R. Civ. P. 12(b)(6), for failure to state a claim. Dkt. No. 5. The plaintiff—at the time, represented by counsel—opposed the motion. Dkt. No. 11.

IV. **Analysis**

A. <u>Governing Law</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); <u>Gibson v. City of Chicago</u>, 910 F.2d 1510, 1520 (7th Cir. 1990)

3

(citation omitted). In considering a motion to dismiss brought under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011) (citation omitted). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id., citing Twombley, 550 U.S. at 566. In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together." Carlson v. CSX Transp., Inc., 758 F.3d 819, 826-27 (7th Cir. 2014) (quoting Swanson v. Citibank, N.A., 614 F.3d 400, 404–05 (7th Cir. 2010)).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that the defendants: 1) deprived her of a right secured by the Constitution or laws of the United States; and 2) acted under color of state law. Buchanan-Moore v. Cnty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980).

B.  Unlawful Detention Claim

The plaintiff's complaint framed her first cause of action as "unlawful detention." The facts alleged in the complaint are thin, but it appears that the defendant arrived at Elsa's and spoke with two people—the manager and a server—before speaking with the plaintiff. The complaint describes the exchange between the two as being brief: the plaintiff told the defendant that she did not agree to pay for food other people had ordered, and accused the restaurant of trying to make her pay because of her status as a celebrity. It appears that the defendant arrested the plaintiff immediately after this conversation occurred.

Based on these sparse facts, it does not appear that there was any pre-arrest "detention" of the plaintiff. The defendant walked up to the plaintiff, talked to her for a few minutes, then arrested her. In order to survive a motion to dismiss, the plaintiff must provide more facts than these.

The court then turns to the question of whether the defendant unlawfully detained the plaintiff after arresting her. Again, the complaint provides few facts. The complaint states more than once that the defendant "arrested, jailed and sought the prosecution" of the plaintiff for "absconding without paying." See Dkt. No. 1 at 4. It states that the defendant "knowingly extended the detention" of the plaintiff without reasonable suspicion. Yet nowhere in the complaint, nor in the pleadings, does the plaintiff shed light on how long she was detained. This is relevant information.

5

> The Fourth Amendment protects against unreasonable seizures; an arrest is a seizure, and the Fourth Amendment affords persons who are arrested the further, distinct right to a judicial determination of probable cause 'as a prerequisite to extended restraint of liberty following arrest.'" *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). In *Gerstein*, the Supreme Court held the judicial determination of probable cause must be "prompt," a holding that "acknowledges that prolonged pretrial detention occasions serious interference with liberty rights." *Willis v. City of Chicago*, 999 F.2d 284, 287 (7th Cir.1993). And, in *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) the Court refined "prompt" with the "general rule that persons arrested without a warrant must receive a judicial determination of probable cause within 48 hours." *Lopez*, 464 F.3d at 719 (citing *McLaughlin*, 500 U.S. at 56–57, 111 S.Ct. 1661).
>
> Riverside's rule established a "48–hour burden-shifting approach," meaning, as applicable here, that detentions less than 48 hours are presumptively reasonable and "the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable." *Portis v. City of Chicago*, 613 F.3d 702, 704 (7th Cir.2010). In *Riverside*, the Supreme Court gave examples of unreasonable delays: "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." 500 U.S. at 56, 111 S.Ct. 1661. The Seventh Circuit has also held that "prolonging the detention of an arrestee to investigate crimes other than the one for which he had been arrested" runs afoul of Riverside. *Wells v. City of Chicago*, 2012 WL 116040, at *6 (N.D.Ill. Jan. 16, 2012) (citing *Willis v. City of Chicago*, 999 F.2d 284, 288–89 (7th Cir.1993)).

<u>Flint v. City of Milwaukee</u>, 91 F. Supp. 3d 1032, 1054-55 (E.D. Wis. 2015).

Here, the plaintiff does not indicate what time the defendant arrested her. She does not indicate how long she was in custody before she was taken to a judicial officer. She does not even indicate *whether* she was taken to a judicial officer. She states only that she was arrested and jailed, and that the

defendant sought prosecution, but that the prosecutor disagreed. There is nothing in the complaint, or in the pleadings, to allow the court to determine whether the plaintiff's post-arrest detention was reasonable or unreasonable.

The court will give the plaintiff a short period of time to amend her complaint to add relevant facts. If the plaintiff does not file an amended complaint by the deadline the court sets, the unlawful detention claim will be dismissed.

B. False Arrest Claim

The plaintiff alleges that the defendant had no basis for arresting her. She indicates that she did not agree to pay for anyone's food other than her own, did not tell anyone at Elsa's that she would pay for anyone's food other than her own, and did not refuse to pay for her own food. She asserts (without any factual support) that the defendant knew that she was famous, and arrested her for that, not because the defendant had probable cause to believe that she'd committed a crime.

> Probable cause is an absolute defense to a false arrest claim. *Abbott v. Sangamon Cty., Ill.,* 705 F.3d 706, 713–14 (7th Cir.2013). Probable cause exists where "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714 (citing *Thayer v. Chiczewski,* 705 F.3d 237, 246 (7th Cir.2012); *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). While this requires "more than a hunch," it does not require that officers find "that it was more likely than not that the arrestee was engaged in criminal activity." *Abbott,* 705 F.3d at 714 (citing *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134

7

(1959); *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir.2010)). The inquiry is purely objective, requiring an examination of how a reasonable officer would act, knowing what the arresting officer knew at the time of the arrest. *Abbott*, 705 F.3d at 714 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003); *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Tebbens v. Mushol,* 692 F.3d 807, 817 (7th Cir.2012)).

Hardy v. City of Milwaukee, 88 F. Supp. 3d 852, 869-80 (E.D. Wis. 2015).

The plaintiff alleges that the defendant arrested her for "absconding without paying." Wis. Stat. §943.21(1m)(a) states that anyone who, "[h]aving obtained any beverage [or] food . . . at any . . . restaurant . . ., intentionally absconds without paying for it" is guilty of a crime—either a misdemeanor or a felony, depending on the value of the food and beverage. "Section 943.21(1)(a), Stats., is aimed at those who avoid paying for [food or beverages] through an act of fraud." State v. Steckel, 125 Wis. 3d 577 (Ct. App. 1985). One can "abscond" by making misrepresentations intended to mislead the restaurant regarding the bill. Id.

To determine whether the defendant had probable cause to arrest the plaintiff at Elsa's, the court must look at what the defendant knew at the time of the arrest, and determine whether that knowledge would warrant a reasonable officer in believing that the plaintiff intended to escape paying a bill that she owed. The defendant was aware that there had been a 911 call from Elsa's; if she hadn't known that, she would not have gone there, and would not have talked to the manager, the server and the defendant. It is not clear how

8

much the defendant knew of the content of the two 911 calls—she may have known that a group of people had been "rowdy," or that there almost had been a fight, or that only one person was left from the group. But she knew that Elsa's staff had reported something amiss. She also may have known that the staff at Elsa's was trying to "contain" the group, but that only one person remained.

Once the officer arrived at Elsa's, the manager—Brittany Wuerl—told her that the plaintiff had refused to pay the group's bill. The plaintiff argues that this, in itself, was not sufficient to provide probable cause for arrest; she argues that "[the defendant] was required to do more than arresting and jailing [the plaintiff]." Dkt. No. 11 at 7. But the defendant *did* do more. She spoke with a server; the complaint is evasive regarding what that server said to the defendant. She also spoke with the plaintiff; the plaintiff claims that she denied agreeing to pay for any food other than what she ordered, and claims that she offered to pay for what she ordered.

The court does not know what, exactly, the various players said to the defendant. The court does not know how fraught the atmosphere was into which the defendant walked. The court does not know the plaintiff's demeanor toward the defendant (nor the defendant's toward the plaintiff). Likely all of these factors would have been relevant to the defendant's decision to arrest the plaintiff, but the court does not have that information. All the court knows is that the defendant was aware that there was some sort of disturbance at Elsa's, that Elsa's staff believed that the plaintiff was responsible for a bill for

9

food ordered by a group of people, that the plaintiff refused to pay that bill, and that the plaintiff argued that she did not owe the bill. The defendant also may have known that people were leaving in the wake of the disturbance.

Again, because the facts stated in the complaint are so thin, it is difficult for the court to determine whether the false arrest charge should survive a motion to dismiss. The court again will give the plaintiff time to file an amended complaint to provide additional facts. The court notes a few other points, however.

The plaintiff argues that the incident at Elsa's—a dispute over a restaurant bill—was a "civil" dispute, and thus that it could not give rise to probable cause for a criminal arrest. Dkt. No. 11 at 4. This is a strange argument. A custody dispute between estranged parents is a civil dispute, until one parent kidnaps the child. A disagreement over a debt is a civil dispute, until the creditor decides to collect by slugging the debtor. The question of whether a situation is civil or criminal depends on context and intent, and intent is a very fact-bound inquiry. Once cannot simply cite a few cases—as the plaintiff has done—in which courts found that an individual did not have criminal intent under particular circumstances, and conclude that there could never be criminal intent under similar circumstances.

The plaintiff also argues biased witnesses can negate probable cause. <u>Id.</u> at 9. The plaintiff provides no explanation of why she believes that the Elsa's staff—the manager or the server—were "biased" against her. She asserts several times in the complaint that she is "famous" and that people know who

she is. It is not clear why, even if this was true, it would cause the staff at Elsa's to be biased against her.

If the plaintiff has any facts to shed light on these questions, she may include them in her amended complaint.

C. Equal Protection Claim

Finally, the plaintiff argues that the defendant violated her Fourteenth Amendment equal protection rights. She claims that "the defendant] singled out [the plaintiff] because she is famous." Dkt. No. 1 at 8. She further argues that the defendant "intentionally treated [the plaintiff] differently from others similarly situated and there is no rational basis for the difference in treatment." Id.

The plaintiff's claim is not the run-of-the-mine equal protection claim. As the Seventh Circuit has noted, a "garden-variety equal protection challenge" is "typically . . . concerned with governmental classifications that affect some *groups* of citizens differently from others." United States v. Moore, 543 F.3d 891, 896 (7th Cir. 2008) (quoting Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008)) (emphasis added by appellate court). The plaintiff alleges that she has been "'irrationally singled out,' without regard for any group affiliation, for discriminatory treatment." Id. (quoting Engquist at 601). This is called a "class-of-one" equal protection challenge; courts recognize such a challenge "where an individual alleges that [she] has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in

treatment.'" Id. (quoting Vill. Of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

To prevail on her class-of-one claim, the plaintiff first must prove that she was intentionally treated differently from others who were situated similarly. Id. at 897. That means she has to identify some similarly-situated people; those similarly-situated people are called "comparators," and they must be "*prima facie* identical in all relevant respects or directly comparable . . . in all material respects" to her. Id. (quoting Racine Charter One, Inc. v. Racine Unified Sch. Dist, 424 F.3d 677, 680 (7th Cir. 2005)).

The plaintiff did not identify any comparators in her complaint. She asserts that she is not required to do so, citing Geinosky v. City of Chicago, 675 F.3d 743, 748 n.3 (7th Cir. 2012). Dkt. No. 11 at 10. She is correct that the Seventh Circuit stated in Geinosky that "[e]ven the more demanding pleading requirements under *Iqbal* and *Twombly* do not require a plaintiff to identify specific comparators in a complaint." Geinosky, 657 F.3d at 748 n.3. But the plaintiff still must articulate sufficient facts to "help distinguish between ordinary wrongful acts" that the defendant might have committed and ""deliberately discriminatory denials of equal protection." Id. at 748. While there may be some cases in which it is enough to state that a defendant intentionally treated a plaintiff differently than others similarly situated, this is not one of those cases.

The facts in this case demonstrate that at some point, the plaintiff was with a group of people. The Elsa's staff delivered food and beverages to that

12

group of people. The behavior of that group, or members of that group, was such that it caused Elsa's staff to call 911 twice. By the time the officer arrived, all of the members of the group had left, except the plaintiff, and no one had paid the bill for the food. While the plaintiff need not name comparators by name, her complaint needed to describe the comparators as a group. The complaint did not do so.

For the sake of argument, the court could consider the comparators to be other Elsa's customers. Under that scenario, the plaintiff herself has articulated, in the complaint, a non-discriminatory, rational basis for the defendant to treat her differently than other Elsa's customers. She was among a group of people who ordered and obtained food and beverage, and did not pay the bill, and she refused to pay the bill. Even assuming that the defendant knew that the plaintiff was famous, her refusal to pay a bill for which the defendant had reason to believe she could be responsible (with no other responsible person present to pay it) provided the defendant with a rational, non-discriminatory reason to treat the plaintiff differently than other Elsa's customers.

Again, the court will give the plaintiff the opportunity to file an amended complaint, and to include any facts that might shed light on her allegation that she was treated differently because she was a celebrity.

D.   Prosecution of the Case

The court notes that at the time the plaintiff filed this complaint, she had an attorney in Milwaukee representing her. That counsel prepared the

complaint in this case, as well as the complaint against the restaurant manager, Brittany Wuerl, filed two months after the plaintiff filed this case. After the parties had fully briefed this motion to dismiss, the plaintiff's lawyer filed a motion to withdraw from representing her, because his law firm represented defendant Wuerl's insurance company, and the insurance company would not waive that conflict. Once this court consolidated the Ramos and Wuerl cases, counsel was conflicted out of this case, as well.

The court had scheduled oral argument on this motion to dismiss. After the plaintiff's counsel withdrew, the court held a telephonic hearing (with the plaintiff on the line), and agreed to adjourn the oral argument to allow the plaintiff to try to find new counsel. Dkt. No. 30. The court also advised the plaintiff about resources for finding counsel in Milwaukee. Id. The court advised the plaintiff that if she was not able to find counsel by the adjourned date, she would have to represent herself at the oral argument. Id.

The plaintiff did not appear on the conference line on the date scheduled for oral argument—October 13, 2016. Dkt. No. 31. The court noted that no attorney had filed a notice of appearance on the plaintiff's behalf. It heard argument from counsel for the defendant, and took the motion under advisement. Id.

The plaintiff has not filed any documents, or contacted the court, since the telephone hearing on September 6, 2015. Defendant Wuerl has filed a motion for summary judgment, dkt. no. 35, to which the plaintiff has not responded; the court will issue a separate ruling on that motion.

V.  **Conclusion**

The court **ORDERS** that the defendant's motion to dismiss is **GRANTED,** effective March 20, 2017, **unless, by the end of the day on Friday, March 17, 2017, the plaintiff files an amended complaint.** If the plaintiff does not file an amended complaint in time for the court to receive it by the end of the day on March 17, 2017, the complaint against defendant Ramos will be dismissed on March 20, 2017 without further notice or hearing.

Dated in Milwaukee, Wisconsin this 13th day of February, 2017.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**United States District Judge**